IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JEROME STRICKLAND, | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 1:20-cv-05768 |
| v. | ) |
| | ) Magistrate Judge Jeffrey I. Cummings |
| VILLAGE OF BOLINGBROOK | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Jerome Strickland brings this action against defendant Village of Bolingbrook ("the Village"), his former employer, alleging violations of the Americans with Disabilities Act, 42 U.S.C. §12111 *et seq.*[1] The Village hired Strickland to work as its Facilities Coordinator in November 2015 and terminated Strickland's employment in April 2019. Strickland now asserts that he was disabled due to a variety of impairments, including hip pain, diabetes mellitus, cirrhosis, and kidney failure while employed with the Village. He further alleges that the Village: (1) failed to provide a reasonable accommodation that would enable him to work despite his disability, and (2) terminated him because of his disability, both in violation of the ADA.

The Village filed a motion for summary judgment, (Dckt. #34), along with the required Rule 56.1 Statement of Uncontested Material Facts, (Dckt. #35). Strickland responded with a memorandum opposing the motion, (Dckt. #42), his response to the Village's statement of facts, (Dckt. #41), and his own Rule 56.1 statement of facts, (*id.*). The Village filed its reply, (Dckt.

---

[1] The parties have consented to proceed before this Court on all matters, including an entry of final judgment, pursuant to 28 U.S.C. §636(e). (Dckt. #10).

1

#45), and this matter is ripe for disposition. For the reasons explained below, the Court finds that the Village is entitled to summary judgment on Strickland's claims.

I. **LEGAL STANDARD FOR CONSIDERATION OF SUMMARY JUDGMENT**

Summary judgment is appropriate when the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). Issues of fact are material if they are outcome determinative. *Hottenroth v. Village of Slinger*, 388 F.3d 1015, 1027 (7th Cir. 2004). When the moving party has met that burden, the non-moving party cannot rely on mere conclusions and allegations to create factual issues. *Balderston v. Fairbanks Morse Engine Div. of Coltec Indus.*, 328 F.3d 309, 320 (7th Cir. 2003). Instead, it must "marshal and present the court with the evidence [it] contends will prove [its] case," and that evidence must be admissible. *Goodman v. Nat. Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010); *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 704 (7th Cir. 2009). Courts review the evidence presented in the light most favorable to the non-moving party and draw all reasonable inferences in its favor. *NES Rental Holdings, Inc. v. Steine Cold Storage, Inc.*, 714 F.3d 449, 452 (7th Cir. 2013). Summary judgment is only granted "if no reasonable trier of fact could find in favor of the non-moving party." *Hoppe v. Lewis Univ.*, 692 F.3d 833, 838 (7th Cir. 2012) (quotations and citation omitted).

II. **BACKGROUND**

The Court must first determine what facts are properly before it for purposes of summary judgment. In its reply, the Village argues that: (1) because Strickland failed to properly deny the assertions made in the Village's Rule 56.1 statement, the facts submitted by the Village should be deemed admitted, and (2) because Strickland's alternate statement of facts was unsupported to

the extent that it relied on an affidavit that directly contradicted his earlier deposition testimony, the statement should not be considered.

        **A.**      **The facts asserted in the Village's Rule 56.1 statement are deemed admitted for the purpose of deciding this motion.**

Local Rule 56.1 governs the procedures for filing and responding to motions for summary judgment in this Court. Pursuant to that rule, the moving party must provide "a statement of material facts" as to which it contends there is no genuine issue for trial. LR 56.1(a); Fed.R.Civ.P. 56(1). The opposing party must then file a response, either admitting or denying each numbered paragraph. *Schrott v. Bristol-Myers Squibb Co.*, 403 F.3d 940, 944 (7th Cir. 2005); LR 56.1(e). If the non-moving party disputes an asserted fact, it must reference "specific evidentiary material that controverts the fact and must concisely explain how the cited material controverts the asserted fact." LR 56.1(e)(3). "[M]ere disagreement with the movant's asserted facts is inadequate if made without reference to specific supporting material." *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003). "When a responding party's statement fails to dispute the facts set forth in the moving party's statement in the manner dictated by the rule, those facts are deemed admitted for purposes of the motion." *Cracco v. Vitran Express, Inc.*, 559 F.3d 625, 632 (7th Cir. 2009); LR 56.1(e)(3).

The Village filed its Rule 56.1 statement (Dckt. #35), and supported many of its asserted facts with citations to Strickland's October 21, 2021 deposition. (Dckt. #36-1). Nonetheless, Strickland denied, in whole or in part, thirteen of the forty-five paragraphs. (Dckt. #41). He admitted the remainder. Strickland's denials did not include *any* citations to evidence, much less explanations regarding how the cited material controverted the asserted facts. Accordingly, the Court agrees with the Village that the facts set forth in its Rule 56.1 statement – which are properly supported by evidence in the record – should be deemed admitted. *See Igasaki v.*

*Illinois Dept. of Fin. And Prof'l Regul.*, 988 F.3d 948, 956 (7th Cir. 2021) (reaffirming that district courts are entitled to require strict compliance with Local Rule 56.1); *Flint v. City of Belvidere*, 791 F.3d 764, 767 (7th Cir. 2015) (same).

      **B.**      **Strickland's statement of facts is unsupported to the extent that it relies on the portions of his affidavit that contradict his earlier deposition testimony.**

After the moving party files its Rule 56.1 statement, the non-moving party may present a separate statement of additional facts that it asserts require the *denial* of summary judgment. LR 56.1(b)(3), (d); *see also De v. City of Chicago*, 912 F.Supp.2d 709, 711-12 (N.D.Ill. 2012). This statement must comply with the same standards as the moving party's statement, meaning the paragraphs must be concise and supported with citations to the evidentiary record. *Id.* In this case, even setting aside the fact that the material facts in the Village's Rule 56.1 statement have been deemed admitted, Strickland's statement of additional facts does not create genuine issues of fact because the material assertions therein are based on inadmissible evidence: namely, a sham affidavit by Strickland that improperly contradicts his prior deposition testimony.

In this Circuit, the sham-affidavit rule "'prohibits a party from submitting an affidavit that contradicts the party's prior deposition or other sworn testimony'" unless the affidavit contains "newly discovered evidence," the deposition testimony was "demonstrably mistaken," or the affidavit is offered to clarify "ambiguous or confusing deposition testimony." *Perez v. Staples Cont. & Com. LLC*, 31 F.4th 560, 569 (7th Cir. 2022), *quoting James v. Hale*, 959 F.3d 307, 316 (7th Cir. 2020); *Donaldson v. Johnson & Johnson*, 37 F.4th 400, 406 (7th Cir. 2022) ("Affidavits offered to contradict the affiant's deposition testimony can be so lacking in credibility as to be entitled to zero weight in summary judgment proceedings") (internal quotation marks omitted). "The rule posits that 'a *genuine* issue of material fact cannot be conjured out of nothing.'" *Kelley v. Stevanovich*, 40 F.4th 779, 787 (7th Cir. 2022), *quoting*

*James*, 959 F.3d at 316. Accordingly, "[a] court is well within its discretion to strike an affidavit that contradicts deposition testimony unless the affiant has offered a plausible explanation for the discrepancy." *Donaldson*, 37 F.4th at 406.

Here, Strickland's affidavit contradicts his earlier deposition testimony – without any explanation – on three key issues:

First, paragraph 8 of Strickland's affidavit states that:

> I was not required to perform physical labor at my job; although I voluntarily assisted technician[s] and performers if needed. The audio systems for the concerts and equipment were subcontracted or outsourced to technicians and was not part of my duties.

(Dckt. #41-4 at 2). However, at his deposition, Strickland gave the following testimony:

> Q. So again, just to recap, as a facilities coordinator, you were required to physically be onsite at or around the Village Hall to run the theater and to meet with people and to open and close the facility, correct?
>
> A. Yes.
>
> Q. Did any of your duties as a facility coordinator involve any physical labor on your behalf or any physical exertion?
>
> A. Yes.
>
> Q. Can you tell me like what type of physical labor, exertion you would have to do?
>
> A. Pulling cables, moving amplifiers, moving televisions around.
>
> Q. Lighting, anything that has to do in the theater that you had to move around?
>
> A. Well, speakers, I didn't touch the lights but speakers, cables, any type of equipment that needed to be moved around or reorganized, set up, yes, I would do that.

(Dckt. #36-1 at 17).[2]

---

[2] The Village attached Strickland's deposition transcript as Dckt. #37-1 (or Exhibit A) and included four pages of the deposition transcript on each page of the exhibit. The deposition citations in this opinion are

Second, in paragraph 31 of his affidavit, Strickland states: "My work was flexible enough that I could have continued to perform my duties remotely, as I had been doing during my entire tenure as Facilities Coordinator." (Dckt. #41-4 at 3). During his deposition, however, Strickland testified as follows:

> Q: As facilities coordinator, did you work at home like you did for Ecolab[3] or did you have to go the Village of Bolingbrook physically to do the work there?
>
> A: Physically.
>
> Q: So you would be within the confines of the Village Hall and the studio in that area the majority of your time as the facilities coordinator?
>
> A: Yes, majority of the time.

(Dkt. #36-1 at 15).

> Q: So again, just to recap, as a facilities coordinator you were *required to physically be onsite* at or around the Village Hall to run the theater and to meet with people and to open and close the facility, correct?
>
> A: Yes.

(*Id.* at 17) (emphasis added).

Third, Strickland asserts in paragraph 32 of his affidavit that he "continued to satisfactorily work two full time jobs[4] in 2017, 2018, and 2019." (Dckt. #41-4 at 3). This statement contradicts Strickland's prior deposition testimony and sworn statements which indicate that he was incapacitated (both physically and mentally) by various health challenges

---

to the page of the exhibit where the testimony can be found, and not to the particular page of the deposition transcript itself.

[3] Strickland worked for a company known as Ecolab (formerly, Nalco) providing computer client services on a remote basis from his home with his laptop between 2015 or 2016 and 2019. (Dckt. #36-1 at 7-8).

[4] The two full-time jobs Strickland references are his jobs with Ecolab and the Village. (*See* Dckt. #41 at 10).

and incapable of working as the Village's Facilities Coordinator from the beginning of 2018 through past the date of his termination in April 2019. In particular:

- Strickland became ill in late 2017, was hospitalized, and had a liver transplant on February 1, 2018. (Dckt. #36-1 at 29-30). He suffered serious complications from the liver transplant surgery which caused his kidney to fail, required him to undergo dialysis treatment three times a week, and necessitated his continued hospitalization for several months. (*Id.* at 29);

- Strickland went on long-term disability through his employment with Ecolab on March 10, 2018. (*Id.* at 19-20);

- On April 2, 2018, Strickland filled out a questionnaire for Ecolab's disability insurer in which he attested, *inter alia*, that he was still hospitalized, bedridden for twenty-three hours a day, and unable to walk, sit for more than thirty minutes a day, manage his finances, or manage tasks needed to maintain his personal hygiene. (Dckt. #36-6 (Exhibit F));

- Strickland remained hospitalized or in a rehabilitation facility until June 27, 2018. (Dckt. #36-1 at 29). Even after he was released, Strickland was unable to walk and remained on dialysis treatment until he received a kidney transplant on April 10, 2019. (*Id.*). Strickland remained in the hospital for about six weeks after his kidney transplant. (*Id.* at 29-30). Following this release from the hospital, Strickland was still unable to walk because of the liver and kidney transplants and issues with his hip. (*Id.* at 30-31);

- On March 4, 2019, Strickland filled out a second questionnaire for Ecolab's disability insurer in which he attested, *inter alia*, that his blood pressure, failed kidney, sore liver, and recovery from a hip replacement prevented him from engaging in any gainful employment. (Dckt. #36-6);

- From January 2018 through past the date of his termination in April 2019, Strickland testified that he needed family members to communicate with the Village on his behalf because he "was totally out of it," "didn't know what was going on," and was "incoherent." (Dckt. #36-1 at 31); and

- Strickland testified that he was unable to return to work until the end of 2019. (*Id.* at 35).

Strickland has failed to offer any explanation for the discrepancies between paragraphs 8, 31, and 32 of his affidavit and his prior deposition testimony and sworn statements on the questionnaires for his insurer. Furthermore, it does not appear that his affidavit was based on newly discovered evidence or was necessary to clarify any ambiguities in his prior testimony.

7

Consequently, the Court will exercise its discretion to apply the sham-affidavit rule and strike the three offending paragraphs of Strickland's affidavit from the record. *See Russell v. Acme-Evans Co.*, 51 F.3d 64, 68 (7th Cir. 1995) (striking only the portions of an affidavit that contradicted the deposition testimony of the affiant).

### C. The Factual Record for Purposes of Summary Judgement

In light of the above rulings, the factual record will consist of the material facts in the Village's Rule 56.1(a)(2) statement (which have been deemed admitted) and the facts from Strickland's Rule 56.1(b)(3) statement of additional material facts *only* to the extent that they are not inconsistent with the Village's statement *and* are properly supported by admissible evidence. With this in mind, the Court now states the facts as favorably to Strickland (the non-moving party) as the record permits.

#### 1. Strickland's Duties as the Village's Facilities Coordinator

Strickland was hired by the Village to work as its Facilities Coordinator in November 2015. (Village ¶8).[5] At the time he accepted the position with the Village, Strickland was also employed full-time by Ecolab (formerly Nalco Chemical Company), where he had worked in computer client services since 1986. (Village ¶7). In his role as Facilities Coordinator, Strickland was responsible for managing the Village's performing arts center, which entailed maintaining the equipment on stage, coordinating the hiring of bands, scheduling the use of the facility, hiring people to run the stage during events, and being present whenever the facility was open for any events. (Village ¶9). His duties also included physical labor, such as moving, setting up, and operating amplifiers, televisions, and other equipment. (Village ¶11).

---

[5] Citations to paragraphs of the Village's Rule 56.1(a)(2) statement of material facts, (Dckt. #35), will be referenced as "Village ¶__." Citations to paragraphs of Strickland's Rule 56.1(b)(3) statement of additional facts, (Dckt. #41), will be referenced as "Strickland ¶__."

Strickland had a desk at the Village Hall and he was required to be present to run the theater, meet with people, and open and close the facility. (Village ¶¶9, 11). Strickland was not required to work on any set days; instead, he had a flexible schedule that sometimes required working nights, weekends, and days during the summer. (Strickland ¶51; Dckt. #46 at 3).

Strickland was qualified for the Facilities Coordinator position and, prior to January 2018, he "got the job done." (Strickland ¶¶46, 47; Dckt. #46 at 2). Strickland did not have a backup and no one was trained to fulfill his duties and responsibilities as Facilities Coordinator in his absence. (Village ¶12). When Strickland was on vacation, no one assumed his duties. (*Id.*). Strickland was told not to take a vacation during the summer because it was the peak season. Instead, he took vacations when there were no events taking place on stage. (*Id.*).

### 2. Strickland's Health-Related Challenges Between the Fall of 2017 and the End of 2019

Strickland developed issues with his hip in August 2017 and required hip replacement surgery. (Village ¶13). Beginning on September 9, 2017, Strickland went on short-term disability leave from Ecolab due to hip pain, diabetes mellitus, and his need for a liver transplant. (Village ¶14). Strickland was in pain in late November 2017, and he became more seriously ill in December. (Dckt. #41-9; Village ¶16). He was hospitalized in January 2018 and received a liver transplant on February 1, 2018. (Village ¶16). On February 2, 2018, Strickland's mother informed the Village that Strickland had undergone a liver transplant the previous day.[6] (Village ¶17). Strickland experienced complications from the liver transplant, which led to kidney failure and required him to undergo dialysis and other treatment three times a week. (Village ¶18). He

---

[6] Strickland testified that his mother and his daughter communicated with the Village between January 2018 and November 2019 to provide it with updates regarding his medical conditions. (Dckt. #36-1 at 31). According to Strickland, "[i]t was up to them to cover for me because I [was] incoherent. I was out of it. I didn't know what was going on." (*Id.*).

remained hospitalized and in rehabilitation facilities for several months following his liver transplant. (*Id.*). Strickland went on long-term disability leave from his employment with Ecolab on March 10, 2018, and he began receiving Social Security Disability income that same day. (Village ¶¶19, 20).

On March 19, 2018, Strickland's mother informed the Village that Strickland was still in the intensive care unit, and that he was having dialysis every other day, was not eating, and could not walk. (Village ¶21). On April 2, 2018, while he was still in the hospital, Strickland filled out a questionnaire for Ecolab's disability insurer in which he attested, *inter alia*, that he was hospitalized, bedridden for twenty-three hours per day, and unable to walk, sit for more than thirty minutes per day, manage his finances, perform tasks needed to maintain his personal hygiene (such as bathing and getting dressed), or engage in other activities of daily living. (Village ¶22). On April 8, 2018, Strickland's daughter informed the Village that Strickland was still undergoing dialysis three times per week and that he was struggling with eating and walking. (Village ¶23). Strickland remained in the hospital or in a rehabilitation facility until June 27, 2018. (Village ¶24). Following his release, he continued to receive dialysis treatment and remained unable to walk. (*Id.*).

On March 4, 2019, Strickland filled out a second questionnaire for Ecolab's disability insurer in which he attested, *inter alia*, that his blood pressure, failed kidney, sore liver, and recovery from the hip replacement prevented him from engaging in any gainful employment. (Village ¶26). He also reported that he napped for about four hours each day, needed assistance with grocery shopping, cooking, cleaning, vacuuming, doing the laundry, and sometimes bathing, and required a cane, walker, and wheelchair. (*Id.*).

Strickland remained on dialysis until he received a kidney transplant on April 10, 2019. (Village ¶24). Strickland remained in the hospital for about six weeks following this transplant. (Village ¶25). After he was released from the hospital, he was still unable to walk because of the transplants and issues with his hip. (*Id.*).

On May 6, 2019, Strickland's hip surgeon signed a statement indicating that Strickland was not totally disabled and could return to work on June 24, 2019. (Village ¶33). However, Strickland was still recovering from his kidney and liver transplants and suffering from high blood pressure related to the transplants, and he did not receive clearance to return to work from the physicians who were responsible for treating his liver and kidney. (Village ¶¶33, 35). On November 23, 2019, Strickland had a second hip replacement, which required four weeks of hospitalization and an additional four weeks of rehabilitation. (Village ¶34). Strickland testified that he was probably unable to return to work until the end of 2019. (Village ¶38).

### 3. The Termination of Strickland's Employment with the Village

Strickland failed to communicate with the Village concerning his ability to return to work, although he did (through his relatives) request "disability paperwork" from the Village and complete the necessary forms. (Village ¶39; Strickland ¶56; Dckt. #46 at 4). Strickland never requested or suggested a reasonable accommodation that would have allowed him to return to work as Facilities Coordinator. (Village ¶41). The Village, for its part, did not initiate contact with Strickland to request medical documentation regarding his condition or the expected duration of his leave. (Strickland ¶55; Dckt. #46 at 4). Nor did the Village – which has its own ADA policy – engage in an interactive process with Strickland to determine whether there might be a reasonable accommodation for his disabilities. (Strickland ¶60; Dckt. #46 at 5; Dckt. #41-16).

By April 2019, Strickland had been absent from work for a significant period of time and he had exhausted his sick leave, vacation time, and comp time. (Village ¶29).[7] While Strickland was absent due to his illnesses, the Village had to scramble to find people to fulfill Strickland's duties, as there was no back-up person to perform Strickland's job. (Village ¶27). On April 8, 2019, the Village terminated Strickland's employment. (Village ¶28). The very next day, April 9, 2019, the Village hired David Tomsky as its Facilities Coordinator. (Village ¶30). On April 14, 2019, Strickland emailed the Village's then-mayor, Roger Claar, asking if he could continue his duties as Facilities Coordinator, adding "[a]m I correct to assume that opportunity is not there?" (Village ¶31). The Mayor did not respond to Strickland's inquiry and Strickland never followed up with him or anyone else at the Village concerning his position as Facilities Coordinator. (*Id.*).

### III. ANALYSIS

The ADA prohibits employers from discriminating "against a qualified individual with a disability because of his disability." 42 U.S.C. §12112(a). Unlawful discrimination under the ADA includes both the failure to provide reasonable accommodation and discriminatory discharge on account of disability. *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 563 (7th Cir. 1996). Strickland alleges that he was the victim of both.

#### A. Strickland's failure to accommodate claim fails for three reasons.

To establish a failure to accommodate claim under the ADA, a plaintiff must show that: (1) he was a qualified individual with a disability; (2) the employer was aware of his disability; and (3) the employer failed to reasonably accommodate the disability. *E.E.O.C. v. Sears, Roebuck, & Co.*, 417 F.3d 789, 797 (7th Cir.2005); 42 U.S.C. § 12112(b)(5)(A). In this case, the

---

[7] The first payroll missed by Strickland was at the beginning of April 2018. (Strickland ¶70; Dckt. #46 at 7).

Village does not contest that Strickland was disabled throughout his employment at the Village. (Dckt. #37). Instead, it argues that: (1) Strickland was not a "qualified individual with a disability" within the meaning of the ADA at the time of his termination; (2) Strickland has failed to offer evidence that a reasonable accommodation existed that would have enabled him to perform the essential functions of his job; and (3) its failure to engage in the interactive process with Strickland is immaterial. The Court agrees on all counts.

### 1. Strickland was not a qualified individual with a disability at the time of his termination.

Under the ADA, a qualified individual is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. §12111(8). To determine whether a plaintiff is qualified, courts apply a two-part test. *Weiler v. Household Fin. Corp.*, 101 F.3d 519, 524 (7th Cir. 1996). First, the plaintiff must satisfy "the prerequisites for the position," such as possessing the appropriate educational background and employment experience. 29 C.F.R. Pt. 1630, App.§1630.2(m). Second, the plaintiff must be able to "perform the essential functions of the position held or desired, with or without reasonable accommodation." *Id*. The question of whether an individual is a qualified refers to the individual's condition at the time of the alleged adverse employment decision. *Nowak v. St. Rita High Sch.*, 142 F.3d 999, 1003 (7th Cir. 1998); *Bombard*, 92 F.3d at 563. "[T]he burden of proof on the issue of capability is not on the employer but on the plaintiff." *Miller v. Ill. Dept. of Corrs.*, 107 F.3d 483, 484 (7th Cir. 1997).

In this case, Strickland has failed to raise a genuine issue of material fact regarding whether he was a qualified individual with a disability because the undisputed facts show that he was unable to perform the essential functions of his position as a Facilities Coordinator at the time he was terminated on April 8, 2019. In particular, on March 4, 2019 (just over a month

before his termination), Strickland submitted a questionnaire to Ecolab's disability insurer in which he stated that his multiple medical conditions rendered him unable to "engag[e] in any gainful employment" and certified that the statement was "true and complete to the best of [his] knowledge and belief."  (Village ¶26; Dckt. #36-6 at 6).  Strickland was also on long-term disability leave from Ecolab at the time of his termination and he had not been cleared to return to work by any of his multiple physicians.[8]  Furthermore, Strickland was still on dialysis and his renal system was in such poor condition that he received a kidney transplant on April 10, 2019 (two days after his termination).  He was hospitalized for six weeks after his kidney transplant and he remained unable to walk even after his release from the hospital.  Finally, per his own testimony, Strickland's mental state at this time would have rendered him unable to perform his duties.  *Supra*, at n. 6.

       Strickland's position as Facilities Coordinator required his physical presence on the job. *See* Section II(C)(1), *supra*.[9]  Yet, it is undisputed that Strickland was unable to come to the Village to perform his job duties at the time he was terminated for the multiple reasons stated above.  As such, Strickland was not a qualified individual with a disability and his ADA claim fails.  *See, e.g., Severson v. Heartland Woodcraft, Inc.*, 872 F.3d 476, 481 (7th Cir. 2017) ("The rather common-sense idea is that if one is not able to be at work, one cannot be a qualified individual.") (internal quotation marks omitted); *Basden v. Prof'l Transp., Inc.*, 714 F.3d 1034, 1037 (7th Cir. 2013) ("A plaintiff whose disability prevents [him] from coming to work regularly

---

[8] Indeed, Strickland was not cleared to return to work by any physician until May 6, 2019, when he received medical clearance from one physician (who was treating his hip condition) but not from the others who were treating him in connection with his kidney and liver transplants, arguably more serious conditions.  (Village ¶33).

[9] Even Strickland grudgingly concedes that "some part of the job required [him] to be physically present." (Dckt. #42 at 5).

cannot perform the essential functions of [his] job, and thus cannot be a qualified individual for ADA purposes."); *Oestringer v. Dillard Store Servs., Inc.*, 92 Fed.Appx. 339, 342 (7th Cir. 2004) ("Oestringer's extended absence – which had no definite endpoint – shows that she was not a 'qualified individual' when Dillard terminated her employment because she could not attend work."); *Harris v. Proviso Area for Exceptional Children*, 581 F.Supp.2d 942, 958 (N.D.Ill. 2008) (finding plaintiff was not a qualified individual where it was "clear that at least from [p]laintiff's perspective, her condition prevented her from coming to work.").

### 2. Strickland has failed to identify a reasonable accommodation that would have enabled him to perform the essential functions of his job.

Where – as here – "a disabled employee cannot perform the essential functions of a job, the court must consider whether any reasonable accommodation by the employer would help the employee to perform those functions." *Amadio v. Ford Motor Co.*, 238 F.3d 919, 928 (7th Cir. 2001). The parties dispute whether the Village could have provided Strickland with such a reasonable accommodation, and it is Strickland's "burden to produce evidence sufficient to permit a jury to conclude that [he] would have been able to perform the essential functions of h[is] job with a reasonable accommodation." *Basden*, 734 F.3d at 1037. Strickland must also provide evidence that he requested an accommodation from the Village. *Stetler v. Wisconsin Physicians Serv. Ins. Corp.*, 950 F.3d 488, 491 (7th Cir. 2020); *Preddie v. Bartholomew Consol. Sch. Corp.*, 799 F.3d 806, 813 (7th Cir. 2015).

As an initial matter, Strickland's failure to accommodate claim fails because he has provided no evidence that he (or his relatives on his behalf) requested an accommodation from the Village. (Village ¶41); *see Preddie*, 799 F.3d at 813 ("Although it is fair to assume that the BSCS was aware of Mr. Preddie's diabetic condition, there is no evidence to suggest that Mr. Preddie ever requested an accommodation for this condition, other than intermittently requesting

15

days off throughout the school year. Without such a request, we conclude that Mr. Preddie's failure to accommodate claim under the ADA cannot survive summary judgment."); *Stetler*, 950 F.3d at 491.

Even if Strickland had requested an accommodation, his claim would still fail because the two potential accommodations that he has identified are not reasonable accommodations under Seventh Circuit precedent. First, Strickland testified in his deposition that the Village should have held his position open and waited for him until he was able to come back. (Dckt. #36-1 at 39). Because Strickland did not have an expected return to work date at the time of his termination, his suggestion that the Village should have accommodated him by holding his position open until he was able to return equates to a request for an indefinite leave of absence. This would not be a reasonable accommodation as a matter of law because "'[t]he ADA does not require an employer to accommodate an employee who suffers a prolonged illness by allowing him an indefinite leave of absence.'" *Haschmann v. Time Warner Ent. Co.*, 151 F.3d 591, 602 (7th Cir. 1998), *quoting Nowak*, 142 F.3d at 1004; *Severson*, 872 F.3d at 479.[10]

Second, Strickland points out that other employees took over his duties while he was absent from his job and asserts that "circumstances might exist when employees working in teams are able to share duties among themselves, so that such sharing might be a form of reasonable accommodation." (Dckt. #42 at 6 (citing *Miller v. Ill. Dept. of Transp.*, 643 F.3d 190, 199-200 (7th Cir. 2009)). However, *Miller* is inapposite. In that case, the employer had

---

[10] The fact that the Village went above and beyond the requirements of the ADA when it accommodated Strickland by keeping his job open while he was absent from January 2018 through April 2019 did not obligate the Village to keep Strickland's job open indefinitely. *See Amadio*, 238 F.3d at 929-30; *Vande Zande v. State of Wis. Dept. of Admin.*, 44 F.3d 538, 545 (7th Cir. 1995) ("[I]f the employer . . . bends over backwards to accommodate a disabled worker – goes further than the law requires . . . it must not be punished for its generosity by being deemed to have conceded the reasonableness of so far-reaching an accommodation."); *see also Severson*, 872 F.3d at 479 ("A multi month leave of absence is beyond the scope of a reasonable accommodation under the ADA.").

16

provided a team of employees with whom plaintiff worked with the flexibility to allocate tasks among themselves based upon the employees' skills, abilities, and limitations. *Miller*, 643 F.3d at 199-200. Plaintiff requested to be exempted from one of the duties that the team performed and to instead perform other aspects of the team's work as his proposed accommodation. Since plaintiff's request did not require the employer to do anything it was not already doing, the Seventh Circuit held that a jury should consider whether plaintiff's proposed accommodation was reasonable in light of the employer's past flexibility and plaintiff's work environment. *Id.*, at 200.

In this case, Strickland worked without a team or a backup prior to the onset of his disabling conditions. Thus, unlike in *Miller*, Strickland was proposing a system that was inconsistent with the Village's prior practice. Moreover, because Strickland was not capable of coming into work or performing any gainful employment at the time of his termination, his proposal to share job duties with others would "equate, essentially, to reassignment or delegation of the job itself," which is *not* a reasonable accommodation as a matter of law. *Id.*, at 199 (citing cases); *James v. Hyatt Regency Chicago*, 707 F.3d 775, 783 (7th Cir. 2013).

### 3. The Village's failure to engage in the interactive process with Strickland is immaterial given that there was no reasonable accommodation.

Strickland asserts that the Village failed to engage with him in an interactive process to determine a reasonable accommodation. (Dckt. #42 at 8-10). The Village concedes this point but asserts that it cannot be liable for any failure to engage in the interactive process since it has shown that no reasonable accommodation was possible under the facts in this case. (Dckt. #45 at 11). The Village is correct. As the Seventh Circuit has repeatedly held (and even Strickland

17

recognizes),[11] the "'[f]ailure to engage in this 'interactive process' cannot give rise to a claim for relief . . . if the employer can show that no reasonable accommodation was possible.'" *Sansone v. Brennan*, 917 F.3d 975, 980 (7th Cir. 2019), *quoting Hansen v. Henderson*, 233 F.3d 521, 523 (7th Cir. 2000); *Severson*, 872 F.3d at 480 n.1 ("Failure of the interactive process is not an independent basis for liability under the ADA.") (internal quotation marks omitted).

> **B.  Strickland has failed to present evidence sufficient to allow a reasonable jury to find that the Village terminated him because of his disabilities.**

To establish an ADA disparate treatment claim, a plaintiff must prove that: (1) he is disabled within the meaning of the ADA; (2) he is qualified to perform the essential functions of the job, either with or without reasonable accommodation; and (3) his disability was the "but for" cause of the adverse employment action. *Castetter v. Dolgencorp, LLC*, 953 F.3d 994, 996 (7th Cir. 2020).

Strickland's disparate treatment claim fails for the following reasons. First, as explained above, summary judgment is proper because Strickland was not a "qualified individual" at the time of his termination. *See* Section III(A)(1). The Court further finds that Strickland has failed to present any evidence that the Village would have retained him *but for* his disability. Mayor Claar testified that the Village terminated Strickland because he had run out of sick leave and vacation days. (Dckt. #41-2 at 6) ("Well, he had sick leave and vacation time, a tremendous amount of comp time. When those were all expired, they cut him off."). Moreover, the Village did not have an employee who was trained to replace Strickland and it scrambled to find people to fill in during his absence. (Village ¶¶12, 27). Strickland has presented no evidence to rebut the Village's stated rationale for his termination or to cast doubt on its honesty. *Castetter*, 953 F.3d at 997 ("The only concern in reviewing an employer's reasons for termination is the

---

[11] (Dckt. #42 at 8).

honesty of the employer's beliefs.") (internal quotation marks omitted). Nor has he presented any "evidence that similarly situated nondisabled persons received more favorable treatment" by, for example, retaining their jobs despite not showing up to work for more than fourteen months as he did. *Timmons v. Gen. Motors Corp.*, 469 F.3d 1122, 1129 (7th Cir. 2006).

For these reasons, the Court finds that Strickland has failed to present sufficient evidence to raise a genuine issue of material fact as to whether he was terminated because of his disability. Consequently, the Village is entitled to summary judgment on Strickland's ADA disparate treatment claim.

## CONCLUSION

For all of the above reasons, the Village's motion for summary judgment, (Dckt. #34), is granted.

**ENTERED:** September 23, 2022

**Jeffrey I. Cummings**
**United States Magistrate Judge**